**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MOLLY K.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 C 3415** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant Molly K. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's claim for Supplemental Security Income ("SSI") under Title VI of the Social Security Act. 42 U.S.C. §§ 1382c(3)(A). The Commissioner has brought a cross-motion for summary judgment seeking to uphold the Social Security Agency's decision to deny SSI benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3). For the reasons stated below, Claimant's motion for summary judgment [8] is granted and the Commissioner's motion for summary judgment [19] is denied.

## I. BACKGROUND

### A. Procedural History

On July 29, 2014, Claimant filed a disability application alleging a disability onset date of February 2, 2014. (R. 23). Her claim was denied initially on January 7, 2015 and upon

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion. Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Molly K. as Claimant.

reconsideration on June 15, 2015. (R. 90, 122). On August 29, 2017, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. (R. 23-36). The Appeals Council denied review on March 9, 2018, making the Appeals Council's decision the Commissioner's final decision. (Tr. 1-10). *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in District Court.

### B. Medical Evidence

#### 1. Evidence from Claimant's Treatment History

Claimant suffers from lower back pain, fibromyalgia, anxiety, and depression. On May 6, 2014, Claimant was admitted to UnityPoint Methodist Hospital in Peoria, Illinois with complaints of depression and lower back pain that did not radiate into her legs. (R. 683). Treating physician Dr. Mohammed Shakaib noted severe pain that prevented Claimant from performing a straight leg test. [2] An MRI of Claimant's lumbar spine showed no disc herniation or spinal stenosis though degenerative changes were noted throughout the lumbar spine and at T12-L1. (R. 685-86). Claimant was given an epidural injection that only provided partial relief for four to five days. (R. 470).

Claimant's primary physical pain is related to her fibromyalgia. She began treatment with rheumatologist Dr. Vaughn Hanna in 2004. (R. 980). The record contains multiple treatment notes from Dr. Hanna showing that Claimant had no swelling in her peripheral joints, no weakness or focal neurological deficits, and an active range of motion in her cervical spine, lumbar spine, shoulders, and hips. (R. 536, 732). Nevertheless, Dr. Hanna credited Claimant's multiple complaints of fibromyalgia pain and prescribed an array of pain medications and muscle relaxants to treat it. These included Norco, Naproxen, methadone, Lyrica, Valium, Celebrex,

---

[2] A straight leg raise test is used to determine if a person's lower back pain is due to a lumbosacral nerve root irritation. https://www.ncbi.nlm.nih.gov/books/MBK539717 (last visited July 24, 2019).

and Fentanyl. (R. 537, 608). Dr. Hanna prescribed these medications throughout Claimant's alleged disability period and often did so by combining them with one another. On March 18, 2017, Dr. Hanna approved the ongoing use of narcotics for Claimant by filing a Letter of Medical Necessity for Long-Term Opioid Use with the Illinois Department of Healthcare and Family Services. The letter states that Claimant required continued use of Norco to treat her fibromyalgia pain without tapering off it.[3] (R. 843).

Claimant also suffers from depression and anxiety. On November 18, 2014, Dr. Atul Sheth evaluated her mental status. Claimant told Dr. Sheth that she was stressed by her fibromyalgia pain and by financial difficulties that required her to live in her mother's basement. (R. 648). Claimant alleged anxiety, difficulty breathing, and feeling mentally foggy. Dr. Sheth prescribed Klonopin, Wellbutrin, and Celexa. (R. 650). He noted on February 24, 2015 that Claimant's condition had improved and continued her medications. (R. 662-63).

On June 24, 2016, Claimant began treatment with psychiatrist Dr. Benjamin Shepherd. Dr. Shepherd noted that Claimant was extremely fatigued during the day but still needed to take Ambien to sleep at night. He diagnosed an anxiety disorder and a major depressive disorder. (R. 855). Claimant continued her treatment with Dr. Shepherd through at least January 10, 2017. Dr. Shepherd found on that date that Claimant's mood was euthymic, her attention span was within normal limits, and her fund of knowledge was good. Dr. Shepherd revised his diagnosis to reflect an anxiety disorder and a major depressive disorder in partial remission. (R. 861).

---

[3] The record also contains numerous entries concerning care that Claimant received from her primary care physician Dr. Timothy Pratt and other medical providers. The Court has carefully reviewed these entries but does not summarize them because they are not relevant to the fibromyalgia analysis.

## 2.    Evidence from State-Agency Doctors

On December 11, 2014, Dr. Charles Carlton examined Claimant at the request of the SSA and issued a report.  Dr. Carlton's report shows that he reviewed a "partial medical record" without having access to Claimant's complete records including those from rheumatologist Dr. Hanna.[4]  (R. 508).  Dr. Carlton noted that Claimant showed multiple tender points throughout her body that were consistent with fibromyalgia but that she also had a full and painless range of motion in all joints except the hips, knees and the lumbar spine.  She also had normal grip s strength bilaterally as well as normal fine and gross motor skills in both hands.  (R. 511).  Dr. Carlton concluded that Claimant could lift more than 20 pounds, "safely" sit and stand, and could walk more than 50 feet without an assistive device.  (R. 511).

On January 7, 2015, state-agency medical expert Dr. Vidya Madala found that Claimant could carry out light work, meaning that she could occasionally push or pull up to 20 pounds and lift or carry up to 10 pounds frequently.  Claimant could also stand and stand/walk up to six hours a day.  (R. 97).  At the time that Dr. Madala issued her report, however, the SSA had not determined that fibromyalgia constituted a severe medical impairment for Claimant.  (R. 95).  Based on additional records that demonstrated such an impairment, Dr. Mina Khorshidi concluded on June 11, 2015 that Claimant was more limited than Dr. Madala stated.  Dr. Khorshidi found that Claimant could frequently lift or carry up to 10 pounds, sit for six hours a day, but only stand or walk up to four hours.  Dr. Khorshidi also noted that Claimant was obese

---

[4] SSR 12-2p states that when the SSA purchases a consultative exam for a claimant alleging fibromyalgia "it is important that the medical source who conducts the CE has access to longitudinal information about the person."  SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012).  Dr. Carlton noted that Claimant was being treated by Dr. Hanna, (R. 509), but he did not have Dr. Hanna's treatment notes available to him. Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators."  *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).  They do not have the force of law or a regulation, though they are binding on the SSA.  *Id.*

by having a body mass index of 34. (R. 115). Claimant could occasionally climb ramps and stairs, crouch, stoop, and crawl but could never climb ladders, ropes, or scaffolds. (R. 116).

State-agency psychologist Dr. Ellen Rozenfeld also issued a report concerning Claimant's mental status on May 14, 2015. Dr. Rozenfeld found that Claimant would be moderately limited in her ability to carry out detailed instructions, maintain attention for extended periods, and carry out a normal workday without interruptions from her psychological symptoms. She would have no significant restrictions in her capacity to carry out short and simple instructions, would be able to maintain work attendance, and could make "simple work-related decisions." (R. 117). Dr. Rozenfeld further found that Claimant could tolerate "typical supervision" and perform simple work "of a routine and repetitive type." (R. 118).

### 3. Evidence from Claimant's Treating Physician

On January 22, 2015, Dr. Hanna issued a medical letter stating that Claimant's medical condition rendered her "totally disabled." (R. 534). Dr. Hanna supplemented this statement on May 26, 2017 with a Fibromyalgia Residual Functional Questionnaire and an RFC assessment for Claimant. He stated that Claimant would be absent from work more than three times a month and would suffer sedation from her medications. (R. 981). Pain and fatigue would also impair her ability to work full time. (R. 981, 982). Claimant would only be able to sit for 30 minutes at a time, stand for 15 minutes, and walk for 10 minutes. (R. 983). Dr. Hanna also included other exertional restrictions by limiting Claimant to lift and carry ten to 15 pounds occasionally but only five pounds frequently. She could not push or pull from a sitting position for six hours a day, would be off task up to 30 percent of the time, and would be absent from work five or more days each month. (R. 985).

### C. Evidence From Claimant's Testimony

Claimant appeared at the administrative hearing held on June 15, 2017. She told the ALJ that she sees rheumatologist Dr. Hanna every three months for fibromyalgia and also seeks treatment for depression every three months from psychiatrist Dr. Ben Shepherd. (R. 49, 63). Claimant lives alone and has custody of her two small children two days a week. She tries to drive them to school but her mother often has to drive instead when Claimant's pain and fatigue prevent her from doing so. (R. 52-53; 64; 71, "Just trying to even get them where they need to go, like school in the morning and stuff like that is a huge issue"). Claimant is unable to cook for her children when they are with her and often misses their baseball games and parent-teacher conferences. (R. 71).

Claimant told the ALJ that her symptoms wax and wane and that she has good days and bad days, though the bad days outnumber the good ones. (R. 74). On good days Claimant is able to get out of the house, visit people, and do errands; on bad days she struggles to get the mail. (R. 74). Her symptoms include nausea, pain, migraine headaches, and fatigue. (R. 64). Claimant stated that she performs only a few household chores. (R. 66-67). A friend helps her do many normal tasks such as making the bed or taking out the trash. (R. 68-69). Claimant also needs help at times with bathing and normally showers only once every three days. (R. 74). Sleep is not refreshing for Claimant and she is exhausted only hours after awakening even if she has slept all night. (R. 71). At times she needs to nap up to four hours a day and sometimes sleeps for periods as long as 26 to 32 hours. (R. 72).

### D. The ALJ's Decision

On August 29, 2017, the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability decisions, the ALJ found at

Step 1 that Claimant had not engaged in substantial gainful activity since her application date of July 29, 2014. (R. 25). Claimant's severe impairments at Step 2 were a spine disorder, fibromyalgia, an affective disorder, and an anxiety disorder. (R. 25). None of these impairments met or medically equaled a listing at Step 3 either singly or in combination. (R. 26).

Before moving to Step 4, the ALJ considered Claimant's testimony on the severity and frequency of her symptoms and found that they "were not entirely consistent with the medical evidence." (R. 29). The ALJ also assigned weights to the reports of several medical experts. She gave great weight to non-examining expert Dr. Khorshidi's finding that Claimant could carry out light work but assigned little weight to the report of treating physician Dr. Hanna, who found that Claimant was significantly more restricted. (R. 33-34). The ALJ also gave "significant" weight to the report of state-agency psychologist Dr. Rozenfeld. (R. 33). Based on these findings the ALJ concluded that Claimant had the residual functional capacity ("RFC") to carry out sedentary work as that term is defined under 20 C.F.R. § 404.1567(a) except that Claimant could only walk or stand for four hours in an eight-hour workday. She could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. Claimant's mental impairments limited her to tolerating "only a few changes" in a routine work setting, performing simple, routine, and repetitive tasks, and being off task up to 15 percent of the time. (R. 28).

Based on the testimony of a vocational expert ("VE"), the ALJ found at Step 4 that a person with Claimant's RFC would be unable to perform Claimant's past relevant work as a massage therapist. (R. 34). The VE testified that jobs existed in the national economy that a person with Claimant's RFC assessment could perform. Accordingly, the ALJ determined at

Step 5 that Claimant was not disabled from July 29, 2014 through the date of the ALJ's decision on August 29, 2017. (R. 35).

## II. LEGAL ANALYSIS

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will

affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III.  DISCUSSION

Claimant argues that the Commissioner's decision requires remand because the ALJ: (1) did not account for SSR 12-2p in her decision; (2) failed to adequately address Claimant's testimony about the severity and frequency of her symptoms; (3) erred by giving little weight to Dr. Hanna's report; and (4) improperly addressed her mental and physical RFC.

### A.    The ALJ Erred by Failing to Cite SSR 12-2p.

On July 12, 2012, the SSA issued SSR 12-2p entitled "Title II and XVI:  Evaluation of Fibromyalgia" as guidance on how an impairment of fibromyalgia can be identified and how it should be evaluated.  SSR 12-2p, 2012 WL 3104868, at *1.  Such guidance was necessary because courts had complained prior to SSR 12-2p's issuance that there was "a pervasive misunderstanding of the disease" that made it difficult to properly evaluate an ALJ's consideration of fibromyalgia. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996); *see also Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017) (describing SSR 12-2p as a "sea-change" in fibromyalgia analysis).  The Ruling sets out two separate diagnostic criteria.  The first identifies the factors required for determining that fibromyalgia constitutes a medically-determinable impairment.  2012 WL 3104869, at *2-3.  The second describes the criteria that should be considered to measure the severity of a claimant's symptoms and to assess the appropriate RFC.  These factors closely match those set out in SSR 16-3p, which controls a symptom evaluation, but they also contain issues specific to fibromyalgia such as the widespread nature of pain, the fluctuating nature of its symptoms, and the need to be alert to complaints such as unrefreshing sleep. *Id*. at *3-6.

The ALJ found at Step 2 that fibromyalgia constituted a severe impairment for Claimant. The ALJ then continued her analysis and concluded that the record contradicted part of Claimant's symptom testimony and that she could carry out a reduced range of sedentary work. The ALJ made those findings, however, without mentioning SSR 12-2p at any point in her decision. Claimant argues that the ALJ's omission of SSR 12-2p requires remand. The failure to cite a Ruling is not automatically erroneous if the ALJ applies the appropriate standard to his or her analysis despite that oversight. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). When the ALJ fails to account for a Ruling's standards, however, remand is necessary so that the ALJ can reconsider the evidence in light of the Ruling's guidance. *See Neyhart v. Comm. of Soc. Sec.*, No. 3:17-C-437, 2018 WL 4659265, at *3 (N.D.Ind. Sept. 28, 2018) (addressing SSR 12-2p); *Brown v. Colvin*, No. 15-cv-1246, 2016 WL 5417184, at *6 (C.D.Ill. Sept. 27, 2016).

The ALJ in this case applied a number of factors under SSR 16-3p that overlap with SSR 12-2p. She evaluated Claimant's testimony, for example, by discussing the record, Claimant's ADLs, and by considering the statement of a third-party witness. Taken as whole, however, the ALJ's decision clearly indicates that she overlooked at least four aspects of SSR 12-2p that were crucial to a proper evaluation of fibromyalgia. Like SSR 16-3p, SSR 12-2p instructs ALJs to consider "medications and other treatments the person uses" to control the pain associated with fibromyalgia. 2012 WL 3104869, at *5. As shown more fully below, *infra* at pp. 18-19, the ALJ did not account for Claimant's ongoing – and extensive – need for pain medications and muscle relaxants. Claimant's prescriptions included, at various times, methadone, Norco, Lyrica, Clonazepam, Flexeril, Mobic, Valium, Xanax, Buspar, Chlorzoxazone, Celebrex, Demerol, Naproxen, Zanaflex, Fentanyl, and Lioresal. (R. 393, 485, 537, 543, 608, 749, 806, 819, 838, 928). Other than noting that Claimant stated on one occasion that Norco was helpful for pain,

(R. 30), the ALJ overlooked all of these medications. That fails to comply with SSR 12-2p's directive on this issue and raises serious questions about the degree to which the ALJ recognized the level of pain that Claimant experienced.

Second, the ALJ failed to account for the symptoms of fibromyalgia that SSR 12-2p directs adjudicators to consider. The Ruling identifies "repeated manifestations" of six symptoms related to fibromyalgia – "fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." 2012 WL 3104869, at *2. The ALJ discussed Claimant's cognitive issues, anxiety and depression as part of listings 12.04 and 12.06 but did not address its relation to fibromyalgia. That suggests that the ALJ did not recognize the link between these symptoms and Claimant's disorder. She also failed to address Claimant's allegations of fatigue, which SSR 12-2p identifies as a key symptom of fibromyalgia. 2012 WL 3104869, at *2. The ALJ noted that Claimant stated on several occasions that she was very fatigued, (R. 30-32), but never discussed the issue or seemed to recognize its importance in assessing Claimant's fibromyalgia.[5]

Most importantly, the ALJ did not account for Claimant's unrefreshing sleep. SSR 12-2p places special emphasis on this symptom by including a footnote instructing ALJs to consider testimony "describing a history of non-restorative sleep, such as statements about waking up tired or having difficulty remaining awake during the day, or other statements or evidence . . . reflecting . . . a history of non-restorative sleep." *Id*. at *3 n.11; *see Yates v. Colvin*, 959

---

[5] Plaintiff also took an array of medications for her mental impairments. These included Wellbutrin, Celexa, Effexor, Abilify, Paxil, Cymbalta, Savella, amitryptyline, Prozac, and Latuda as well as Ambien for sleep. (R. 806, 854). These psychotropic medications were taken in combination with prescriptions for pain and muscle spasms. In August 2016, for instance, Claimant was taking a combination of Wellbutrin, Lyrica, Ambien, Norco, Buspar, Xanax, Effexor, and Flexeril. (R. 657-58). Not surprisingly, both Dr. Hanna and Dr. Shepherd noted the sedating effect of these medications. (R. 855, 982). The ALJ should have considered the combined effect these medications had in combination with the fatigue that Claimant said stemmed from her fibromyalgia pain.

F.Supp.2d 233, 241 (N.D.N.Y. 2013) (stating that "sleep disturbances [are] characteristic of fibromyalgia"). Claimant told the ALJ that sleep is not refreshing for her and that she needed to nap up to four hours a day because she was "exhausted" from "not getting the right level of sleep." (R. 71-72). The ALJ noted Claimant's testimony about her need to nap but never addressed her underlying complaint that sleep was not restorative no matter how long she slept.

Third, SSR 12-2p emphasizes that "the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" *Id*. at *6. The fluctuating nature of fibromyalgia's symptoms is such a central feature of the impairment that SSR 12-2p stresses the point three times. *Id*. at *2, 5, 6; *see Heuschmidt v. Colvin*, No. 14 C 4377, 2015 WL 7710368, at *6 (N.D.Ill. Nov. 30, 2015) ("The Ruling concerning fibromyalgia is . . . straightforward; symptoms of FM can wax and wane so that a person may have bad days and good days.") (internal quotes and citation omitted). This issue should have been central to the ALJ's analysis because Claimant testified that her fibromyalgia symptoms waxed and waned and she described exertional limitations associated with her good days and bad days. Nevertheless, the ALJ ignored everything that Claimant stated on this issue and did not address the possibility that her condition might have fluctuated over time. (R. 74). That demonstrates both a failure to consider all of the relevant evidence and a basic misunderstanding of the symptoms related to fibromyalgia. *See Buckner v. Astrue*, 680 F.Supp.2d 932, 941 (N.D.Ill. 2010) (describing a claimant's good days and bad days as a "crucial piece of the bridge" that an ALJ must build in a fibromyalgia analysis); *Thorn v. Berryhill*, No. 15 C 50240, 2017 WL 748596, at *5 (N.D.Ill. Feb. 27, 2017) (remanding when an ALJ fails to account for the good days and bad days associated with fibromyalgia).

Fourth, the ALJ failed to determine at Step 3 whether Claimant's fibromyalgia medically equaled a listing. SSR 12-2p acknowledges that fibromyalgia cannot meet a listing because it is not included as an impairment in Appendix 1 of 20 C.F.R. § 404. "[T]herefore, we determine whether [fibromyalgia] medically equals a listing (for example listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment." SSR 12-2p, 2012 WL 3104869, at *6. The ALJ concluded at Step 3 that (1) Claimant's mental impairments did not meet listing 1.04 (affective disorders) or listing 1.06 (anxiety disorders) and (2) her spine impairment did not meet listing 1.04 (disorders of the spine). (R. 26). Contrary to SSR 12-2p's directive, however, the ALJ did not address which listing she considered for a fibromyalgia equivalency analysis or even mention fibromyalgia at Step 3. *See Miller v. Colvin*, 114 F.Supp.3d 741, 775 (D.S.D. 2015) (stating that meaningful review is not possible when the ALJ does not identify the analogous listing for fibromyalgia).

The Commissioner argues that the ALJ was not required to specifically discuss fibromyalgia at Step 3 because her consideration of listing 1.04 included that impairment. In support, the Commissioner notes that the ALJ stated in broad terms at Step 3 that Claimant "does not have an impairment or combination of impairments" that meet or equal a listing. (R. 26). That is ordinarily enough for a reviewing court to conclude that the ALJ satisfied his or her obligations at Step 3. *Williams v. Colvin*, No. 15 C 7011, 2016 WL 6248181, at *9 (N.D.Ill. Oct. 25, 2016). In this case, however, the ALJ's failure even to cite fibromyalgia at Step 3 raises questions about the degree to which she considered it. Those doubts are more concerning in light of the fact that the ALJ failed to address key components of Claimant's condition. The ALJ herself stressed that the most important aspect of Claimant's fibromyalgia was the pain in her

wrists and hands that prevented her from carrying out her prior work as a massage therapist. (R. 28). At Step 3, however, the ALJ focused on Claimant's lower back pain without addressing Claimant's hands or explaining why spine and hand pain were related to one another.

The ALJ also based her listing 1.04 finding on objective tests like x-rays and MRIs that showed only mild degeneration in the lumbar spine. (R. 26). Contrary to the Commissioner's claim, the ALJ could not have relied on these tests to evaluate Claimant's fibromyalgia condition at Step 3. Courts in this Circuit have repeatedly stated that fibromyalgia pain cannot be adequately assessed through the kind of objective medical evidence that the ALJ relied on at Step 3 and throughout her decision. The Seventh Circuit has described the impairment as follows:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. *There are no laboratory tests for the presence or severity of fibromyalgia.* The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Sarchet*, 78 F.3d at 306-07 (emphasis added); *see also Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) ("The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment."); *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017); *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis. 2001) ("In most cases, there will be no objective evidence indicating the presence or severity of fibromyalgia."). The Commissioner has not provided any reason why the ALJ could have evaluated Claimant's fibromyalgia at Step 3 by relying on objective tests that do not address her condition.

The ALJ further supported her listing 1.04 analysis by stating that Claimant "has a normal gait, grip strength, fine and gross motor skills, motor strength, sensation and reflexes, and intact cranial nerves." (R. 26). The ALJ may have believed that these functional assessments addressed fibromyalgia because at another point in the decision she cited identical criteria to criticize a treating-source report on Claimant's fibromyalgia. (R. 33). In reality, however, nothing that the ALJ cited was relevant to Claimant's condition. A normal gait and normal grip strength do not measure the seriousness of fibromyalgia's symptoms. *Germany-Johnson v. Comm. of Soc. Sec.*, 313 Fed.Appx. 771, 778 (6th Cir. 2008) (stating that a claimant's normal gait has "little relevance" to fibromyalgia); *Grube v. Colvin*, No. 1:14-cv-1294, 2015 WL 5672645, at *5 (S.D.Ind. Sept. 24, 2015); *Lawson v. Astrue*, 695 F.Supp.2d 729, 738 (S.D.Ohio 2010) ("[T]he absence of neurological deficits, and the presence of normal muscle or grip strength, are precisely the type of clinical findings expected to be seen in fibromyalgia patients."). Moreover, no medical expert found that Claimant's cranial nerves had any relation to fibromyalgia. As for tests showing Claimant's normal motor strength and reflexes, they are "precisely the type of testing that doctors frequently use to *rule out* other conditions in diagnosing fibromyalgia." *Lanzi-Bland v. Berryhill*, No. 16 C 8856, 2017 WL 4797529, at *4 (N.D.Ill. Oct. 24, 2017) (rejecting an ALJ's reliance on normal motor strength and reflexes) (citing cases); *see also Rogers v. Comm. of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (finding that evidence concerning normal reflexes and sensation is "inappropriate" in analyzing fibromyalgia symptoms).

The Commissioner also argues that the ALJ did not err at Step 3 because state-agency expert Dr. Khorshidi stated in her report that Claimant's fibromyalgia did not meet or equal a listing. An ALJ is entitled to rely on a state-agency expert's opinion at Step 3 because a listing

determination involves a medical judgment that requires expert advice. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The Commissioner concedes that the ALJ did not cite Dr. Khorshidi at Step 3; rather, she waited until she reached the RFC issue to address the doctor's report. The Court agrees that could be sufficient under some circumstances to support a Step 3 analysis because courts are required to construe disability decisions "as a whole." *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (stating that "it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five").

In this case, however, the ALJ considered Dr. Khorshidi's report in a manner that does not permit the Court to infer that she relied on it at Step 3. Instead of assigning great weight to Dr. Khorshidi's report for all purposes, the ALJ took the unusual step of *restricting* her consideration of the report only for the RFC assessment. (R. 32, "Dr. Khorshidi's opinion [is given] great weight in forming the [RFC]"). The Commissioner has not explained how the ALJ's language can be construed to mean that she considered Dr. Khorshidi's report at Step 3 when the ALJ gave no indication that she did so and specifically limited the scope of her reliance on it. *See Rardin v. Berryhill*, No. 1:16-cv-00511, 2017 WL 1190511, at *4 (S.D.Ind. March 31, 2017) (remanding when an ALJ fails to clarify if he relied on a state-agency expert to assess whether fibromyalgia equals a listing). Combined with the ALJ's failure to cite SSR 12-2p and her citation of objective tests that do not measure fibromyalgia's symptoms, remand is necessary so that the ALJ can address all aspects of Claimant's fibromyalgia with greater clarity.

## B.     The ALJ Improperly Evaluated Claimant's Symptom Testimony

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her

conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878

F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities;

the frequency and intensity of his symptoms; the dosage and side effects of medications; non-

medication treatment; factors that aggravate the condition; and functional restrictions that result

from or are used to treat the claimant's symptoms. 20 C.F.R. § 404.1529(c); SSR 16-3p. When

considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom

evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-

63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for

the symptom evaluation).

The ALJ began her discussion of Claimant's alleged symptoms by citing objective tests

such as x-rays, MRI images, and examination results of her lower back, straight leg testing,

cranial nerves, and normal range of motion. (R. 29-30). As discussed above, *supra* at pp. 15-16,

these tests cannot be used to measure the extent or impact of fibromyalgia's symptoms. Instead

of x-rays, the ALJ should have considered other pain-related evidence such as the medications

that Claimant took. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[T]he ALJ must

consider the claimant's . . . medication[.]"). Plaintiff was prescribed an array of medications for

fibromyalgia, at various times, including methadone, Norco, Lyrica, Clonazepam, Flexeril,

Mobic, Valium, Xanax, Buspar, Demerol, Chlorzoxazone, Celebrex, Naproxen, Zanaflex,

Fentanyl, and Lioresal. (R. 393, 485, 537, 543, 608, 749, 806, 819, 838, 928). Dr. Hanna also

prescribed OxyContin but Claimant could not afford it. (R. 713). Some of these medications

treated pain directly; others were prescribed to relax Claimant's muscles and diminish muscle

spasms. The record further shows that Claimant's need for pain medication was not temporary.

On March 18, 2017, Dr. Hanna sent a Letter of Medical Necessity for Long-Term Opioid Use to

the Illinois Department of Healthcare and Family Services stating that Claimant required

continued use of Norco to treat her fibromyalgia pain. (R. 843). Claimant also testified that her

medications were often insufficient and that she required four to five Norco pain pills and two

Xanax tablets each day to help with her fibromyalgia pain. (R. 59-60).

The ALJ's only account of Claimant's pain treatment was to note that she was given an

epidural injection in June 2014 that provided minimal relief and that she told Dr. Hanna in

March 2016 that Norco helped treat her pain. (R. 30, 749). The ALJ overlooked Claimant's

statements about her pain treatment, the extent and dosage of her medications, and Dr. Hanna's

ongoing attempt to find an effective combination of pain relievers such as Norco and methadone

with muscle relaxants and Lyrica. The fact that Dr. Hanna continued to prescribe such

medications throughout the disability period meant that he thought Claimant's complaints were

valid. *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) ("[T]he fact that physicians

willingly prescribed drugs . . . indicated that they believed the claimant's symptoms were real.").

Given that Dr. Hanna was Claimant's treating physician and was more familiar with her

condition than any other expert, the ALJ should have considered the length to which Dr. Hanna

went in prescribing pain medications instead of citing x-ray and MRI results to discount

Claimant's testimony. *See Stark v. Colvin*, 813 F.3d 684, 687-88 (7th Cir. 2016) (stating that an

ALJ must "consider how the treatments relieved [the claimant's] pain"); *Dominguese*, 172

F.Supp.2d at 1099 (remanding when an ALJ failed to account for fibromyalgia medication).

The ALJ was also obligated to account for Claimant's daily activities. Since the severity

of fibromyalgia cannot be measured through objective tests, Claimant's ability to engage in her

daily activities was one of the primary sources of information that the ALJ could have drawn on

to assess her condition. *See Post v. Comm. of Soc. Sec.*, No. 2:15 C 2110, 2016 WL 1745054, at

*7 (S.D.Ohio May 3, 2016) (noting that ADLs are "especially significant in a fibromyalgia case"). Claimant described a very limited range of activities. Pain and fatigue prevent her from doing most household tasks. Claimant cannot stand at the sink for long to wash dishes and a friend and a housekeeper help with daily chores. (R. 65). Claimant's mother helps drive her children to school and she is unable to make dinner for them on most days. (R. 64, 71). Claimant's condition fluctuates though bad days often outnumber the good days. (R. 74). Her sleep, which is unrefreshing, sometimes extends up to 32 hours at a time. (R. 72). Claimant often needs help bathing and only showers every three days. (R. 74).

The Commissioner argues that the ALJ adequately accounted for Claimant's testimony because he "discussed" her alleged symptoms in light of the medical record. (Dckt. # 20 at p. 9). It is true that the ALJ *reviewed* much of what Claimant stated at the hearing; however, she did not evaluate what Claimant said or explain what it was that led the ALJ to discount Claimant's testimony. Instead, the ALJ repeated the same litany of findings cited throughout her decision for evaluating fibromyalgia: "[C]laimant has normal gait, grip strength, fine and gross motor skills, motor strength, sensation, and reflexes, intact cranial nerves, and good active range of motion in her cervical, thoracic, and lumbar spine." (R. 32). None of these conclusions address the severity of Claimant's symptoms for the reasons discussed earlier, *supra* at pp. 15-16. The ALJ's failure to grasp what was relevant to Claimant's condition weighs against her symptom analysis because a "reviewing court cannot have confidence in an ALJ's evaluation of a condition when the decision reveals a pervasive misunderstanding of that condition." *Ramos v. Astrue*, 674 F.Supp.2d 1076, 1089 n.1 (E.D.Wis. 2009) (addressing fibromyalgia).

The Court recognizes that the objective record was not entirely irrelevant to the ALJ's consideration of Claimant's ADLs. The Commissioner points out that Dr. Carlton found that

Claimant could walk more than 50 feet without an assistive device. The ALJ correctly found that contradicted Claimant's allegation that she could only walk 20 to 30 feet outside her home. (R. 29, 291). Nevertheless, Claimant told the ALJ that she could not work as a massage therapist because of the pain in her hands and wrists – not because she could not walk properly. (R. 28). Claimant's physical therapist agreed that her most serious limitations stemmed from pain in the upper extremities. (R. 823, finding "pain mostly in [the] upper neck, shoulders, and arms"). The ALJ never addressed that issue. The ALJ may have thought that she adequately accounted for it by citing Dr. Carlton's finding that Claimant had normal grip strength. (R. 30). As before, however, that was not a basis for discounting Claimant's testimony because grip strength does not measure the severity of fibromyalgia pain. *See Tully v. Colvin*, 943 F.Supp.2d 1157, 1169 (E.D.Wash. 2013) (criticizing reliance on normal grip strength); *Richardson v. Colvin*, No. CIV-12-390, 2014 WL 1331027, at *4 (E.D.Okla. March 31, 2014) (stating that normal grip strength "does not necessarily mean that [claimant's] fibromyalgia and the pain it causes her are not disabling").

The ALJ also failed to explain why Claimant's ability to walk more than 50 feet in Dr. Carlton's office meant that she would be able to do so on a sustained basis. Claimant told the ALJ that her symptoms fluctuated from being able to walk "around freely" on good days to barely being able to get the mail on bad days. (R. 74). The ALJ overlooked that testimony and never accounted for SSR 12-2p's emphasis on the fluctuating nature of fibromyalgia symptoms. That fails to build a logical bridge between the record and the ALJ's symptom analysis. *See Buckner*, 680 F.Supp.2d at 941.

Finally, the ALJ did not accurately assess important aspects of Claimant's testimony. The ALJ discounted her statements in part on the ground that Claimant was able to care for her

two children. (R. 27). The ALJ overlooked, however, that Claimant also testified that she only had custody of the children two days a week; that fibromyalgia pain prevented her from cooking for them; and that she often missed parent-teacher conferences. (R. 52, 71). Claimant further told the ALJ that pain kept her from bathing more than once every three days and that she still needed help to shower on some days. (R. 74). The ALJ concluded that was evidence of only a "mild" limitation in her ability to manage herself. [6] (R. 27). However, an inability to bathe more than once every three days almost certainly indicates a more serious limitation than the ALJ assessed. Indeed, if Claimant's pain often prevented her from carrying out the minimal task of bathing – and the ALJ did not question her testimony on this issue – it is unclear how the ALJ decided that she had the ability to work full time on an ongoing basis.

The ALJ supported her symptom analysis by considering a report given by Claimant's mother that confirmed much of what Claimant stated. The ALJ gave the statement only "some" weight because (1) the mother was not a medical expert and (2) she was not "a disinterested third party witness." (R. 29). Neither reason is adequate to support the ALJ's finding. SSR 12-2p instructs ALJs to obtain relevant information from sources such as "neighbors, friends, relatives, and clergy." 2012 WL 3104869, at *4. The Ruling specifically defines these individuals as "nonmedical" sources, *id.*, which reflects a conclusion that their information should be taken into

---

[6] The ALJ's assessment of a mild ADL limitation was part of the "special technique" analysis that adjudicators use to assess the severity of a claimant's mental impairments. *See* 20 C.F.R. § 404.1520a (describing the special technique). As part of that evaluation the ALJ also concluded that Claimant had a mild limitation in her ability to interact with others. The ALJ should reconsider this finding since this case already requires remand. She reasoned that Claimant could drive, go out with friends, and go out alone. (R. 26). Claimant told the ALJ, however, that she often could *not* drive because of pain and that she has to cancel her social plans at least half of the time. (R. 75). In addition, the ALJ did not clarify how going out alone showed that Claimant could interact with others. Claimant's behavior at the hearing also raises doubts about the ALJ's finding. Claimant had to be reprimanded – twice – for banging her fist on a table and speaking to the ALJ inappropriately. (R. 58, 66). Indeed, the ALJ threatened to stop asking questions if Claimant did not change her "tone." (R. 66-67). The ALJ must explain more carefully how this evidence supports only a mild limitation in Claimant's ability to interact with others.

consideration notwithstanding that fact. Moreover, third parties such as friends and neighbors are almost by definition *not* disinterested sources of information. *Id.* SSR 12-2p's directive would be pointless if third-party statements must be from neutral medical experts as the ALJ implied. *See Teschner v. Colvin*, No. 15 C 6634, 2016 WL 7104280, at *9 (N.D.Ill. Dec. 6, 2016) ("The regulations permit testimony from 'other persons' such as family members without requiring them to have medical training.") (citing 20 C.F.R. § 404.1520(c)(3)). Remand is therefore necessary so that the ALJ can account for what Claimant told her and apply the proper standard under SSR 12-2p for evaluating the symptoms of fibromyalgia.

### C.      Remaining Issues

Claimant also argues that the ALJ improperly assessed the expert report of Dr. Hanna and failed to adequately explain the basis for her RFC. The Court agrees that remand is required on these issues but addresses them in less detail.

### 1.      Dr. Hanna's Report

Nine days after the administrative hearing, Dr. Vaughn Hanna issued a report that assessed Claimant's exertional and non-exertional work abilities related to fibromyalgia and her mental impairments. He found that she would be able to sit for only 30 minutes at a time, stand for 15 minutes, and walk for ten minutes. Claimant would be limited to sitting for only four hours a day. She would be off task more than 30 percent of the time and would be absent from work five or more days each month. (R. 980-85). A treating source opinion like Dr. Hanna's is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). An ALJ must offer "good reasons" for discounting a treating physician's opinion. That involves assigning a specific weight to the report by

considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention. [7] 20 C.F.R. § 404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009).

The ALJ gave "little" weight to Dr. Hanna's report. In support, the ALJ cited only one reason for rejecting the treating source opinion:

> Dr. Hanna's opinion is inconsistent with the claimant's normal gait, grip strength, fine and gross motor skills, motor strength, sensation, and reflexes, intact cranial nerves, good active range of motion in her cervical, thoracic, and lumbar spine, normal attention and concentration, intact memory, good fund of knowledge, average intelligence, linear and goal directed thoughts, intact association, and good insight and judgment.

(R. 33). The Commissioner argues that the ALJ's reliance on these functional assessments concerning Claimant's gait, strength, and range of motion are sufficient to support the ALJ's disregard for Dr. Hanna's report. To the contrary, the functional criteria the ALJ cited such as grip strength and reflexes are largely irrelevant to Claimant's fibromyalgia symptoms for the reasons stated above, *supra* at pp. 15-16. Since the ALJ cited the same criteria to justify assigning great weight to the report of non-examining expert Dr. Khorshidi, the ALJ failed to explain why Dr. Khorshidi's opinion concerning Claimant's fibromyalgia deserved greater weight than Dr. Hanna's. Greater weight is ordinarily given to an examining source familiar with a claimant's condition than to a non-examining source like Dr. Khorshidi. 20 C.F.R. §

---

[7] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017. 20 C.F.R. § 404.1527c. For claims like Claimant's that were filed before that date, the factors set out in 20 C.F.R. § 404.1527 continue to apply. *See Rockwell v. Saul*, --- Fed.Appx. ---, 2019 WL 3739810, at *4 (7th Cir. Aug. 8, 2019).

404.1527(c)(1) (2017) ("Generally we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

In addition, the ALJ misconstrued the relationship between Dr. Hanna and Claimant. The ALJ stated that he was her primary care physician; in reality, he was a rheumatologist with specialized knowledge about the treatment of fibromyalgia. *See Sarchet*, 78 F.3d at 307 ("Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."). The regulations require an ALJ to consider that fact. 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Claimant also told the ALJ that she had seen Dr. Hanna once every three months for 12 years. (R. 49). The expert report itself states that Dr. Hanna began treating Claimant in 2004. (R. 982). The ALJ ignored that fact and failed to explain why Dr. Hanna's familiarity with Claimant's condition did not deserve greater consideration. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The ALJ is therefore directed to restate her reasons for the weight given to Dr. Hanna's report.

## 2. The RFC Assessments

The ALJ should also restate her reasons for assessing Claimant's physical and mental RFC. SSR 96-8p states that an ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" 1996 WL 374184, at *7. Since the ALJ did not account for the fluctuating nature of Claimant's fibromyalgia symptoms or properly

assess her ability to engage in daily activities, she necessarily failed to explain how Claimant could sustain the ability to work on a continuing basis.

The ALJ was also required to explain why Claimant would be off task up to 15 percent of the time. The Commissioner argues that the ALJ's finding is supported by Dr. Rozenfeld's state-agency report finding that Claimant had a moderate restriction in maintaining concentration, persistence, and pace but that she also had the attention and concentration "to complete a normal work day and work week on a regular basis." (R. 118). The Court disagrees. Neither the Commissioner nor the ALJ has identified any evidence that quantified Claimant's mental restriction into a specific percentage figure for her ability to be on or off-task. Indeed, the ALJ announced the figure of 15 percent in the RFC assessment without even citing it in her discussion. The fact that a state-agency psychologist like Dr. Khorshidi assesses a moderate restriction in mental functioning is not a basis on which an ALJ can ground a specific off-task figure like 15 percent – at least without additional discussion that establishes a logical connection between the evidence and the ALJ's finding. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017) (rejecting an off-task figure of 10 percent based on an expert's assessment of a moderate restriction in concentration, persistence, and pace); *Stacy v. Berryhill*, No. 17 C 6581, 2019 WL 1746207, at *10 (N.D.Ill. April 18, 2019) ("[T]he ALJ appears to have developed her own opinion regarding [claimant's] off-task time. That is impermissible.").

The ALJ's failure to account for Claimant's mental impairment is reflected in her hypothetical questions to the VE. An ALJ is required to explicitly account for a moderate restriction in concentration in the hypothetical questions. *O'Connor-Spinner v. Astrue*, 627 F.3d 615, 618 (7th Cir. 2010). The failure to do so is not erroneous if one of three exceptions is met: (1) the VE was familiar with the claimant's medical record, (2) the hypothetical question

adequately informed the VE of the claimant's underlying limitation, or (3) the questions otherwise accounted or the limitation by using different terms that informed the ALJ of the claimant's restrictions. *Id.* at 619-20.

None of these exceptions apply in this case. The first is inapplicable because nothing suggests that the VE was familiar with anything other than Claimant's testimony at the hearing. (R. 81-82). The ALJ's hypotheticals show that the second and third exceptions also fail to apply. Instead of describing the moderate restrictions that Dr. Rozenfeld assessed, the ALJ asked the VE to consider a hypothetical individual who was limited to carrying out "simple and routine and repetitive tasks." (R. 83). It is well established that such a description of a claimant's ability to work is insufficient to account for moderate limitations in areas like concentration and pace. *Lanigan*, 865 F.3d at 565. As *Lanigan* explains, terms like "simple, routine, and repetitive tasks" address the "speed at which work can be learned" and are therefore "unrelated to whether a person with mental impairment – i.e., difficulties maintaining concentration, persistence, or pace – can perform such work." *Id.* at 565-66. *See also Crump v. Saul*, -- F.3d --, 2019 WL 3451276, at *3 (7th Cir. July 31, 2019) (stating that "observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis[.]"). On remand, the ALJ should explain how she determined that Claimant would need to be off-task 15 percent of the time and submit a hypothetical question to the ALJ that accounts for that finding.

## IV.    CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment [8] is granted. The Commissioner's cross-motion for summary judgment [19] is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall (1) account for the standards set

out in SSR 12-2p, (2) address whether fibromyalgia medically equals a listing at Step 3, (3) re-evaluate Claimant's fibromyalgia symptoms, (4) restate the reasons for the weight given to the report of Claimant's mother, (5) reconsider Dr. Hanna's report, (6) reassess the mental and physical RFC on the grounds stated herein, and (7) resubmit a hypothetical question to the VE that accounts for Claimant's mental impairments.

**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  August 16, 2019**